**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOHNNY C. BORIZOV (M-38390), | ) |
| | ) |
| Petitioner, | ) |
| | ) No. 20 CV 4754 |
| v. | ) |
| | ) Judge Marvin E. Aspen |
| CHARLES TRUITT, Warden, | ) |
| Stateville Correctional Center, | ) |
| | ) |
| Respondent.[1] | ) |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Before us is Johnny C. Borizov's pro se amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. For the reasons set forth below, we deny the petition and decline to issue a certificate of appealability.

**BACKGROUND**

Borizov is currently incarcerated at the Stateville Correctional Center in Joliet, Illinois, in the custody of the warden of that facility, Respondent Charles Truitt. In May 2013, a jury in the Circuit Court of DuPage County convicted Borizov of three counts of first-degree murder and one count of solicitation of murder. The State's theory was that Borizov was legally accountable for the actions of Jacob Nodarse, who admitted that he fatally shot Jeffrey and Lori Kramer and their son, Michael Kramer, who were the immediate family of Angela Kramer, Borizov's ex-fiancée.

---

[1] We have substituted the name of the current warden at Stateville Correctional Center, as required by Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts.

A.      **Trial and Conviction**

The following description of the trial evidence and history of the case is taken directly from the Illinois Appellate Court's decision on Borizov's direct appeal.  *See People v. Borizov*, 2015 IL App (2d) 130736-U.  These facts are presumptively correct on habeas review, *see Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020), and Borizov has not rebutted this presumption.

Jeffrey Kramer, Lori Kramer, and their son, Michael Kramer, were shot and killed in their Darien home at approximately 3 a.m. on March 2, 2010.  Jeffrey and Lori's daughter, Angela Kramer, was in the home at the time of the killings.  Police arrested Jacob Nodarse in Florida two days later.  Nodarse admitted killing the Kramers, but maintained that he had committed the crimes to protect himself and his family.  He explained to investigators that he was expected to give testimony in a custody dispute between defendant and Angela involving their infant son.  He further explained that Angela was threatening to expose members of defendant's criminal organization in an attempt to gain leverage against defendant in the custody dispute.  Nodarse said defendant convinced him that he and his family would be harmed unless he killed the Kramers.  Nodarse later pleaded guilty but mentally ill to the murder of Jeffrey Kramer.  The State agreed to dismiss the murder charges involving Lori and Michael in exchange for Nodarse's testimony against defendant.  The following testimony and evidence was introduced during defendant's jury trial.

*Defendant and the Kramer Family*

Angela testified that she began dating defendant during fall 2007.  Defendant had been friends with her previous boyfriend, Steve Hetman, who had recently died in a motorcycle accident.  Defendant was not employed, but he frequently went out at night, claiming he "had vending machines to go collect money from."  On Halloween 2007, defendant and Angela went to a casino.  Defendant looked at a surveillance camera while the two were alone and said he had to make sure that he was being recorded because he had "people out there doing stuff" for him.

Defendant and Angela became engaged in April 2008.  Angela became pregnant shortly thereafter.  She moved into a Countryside home with defendant in January 2009.  Their son, Nicholas, was born in February 2009.  Tensions arose between defendant and the Kramer family during Angela's pregnancy.  On one occasion, defendant would not allow Lori to attend a doctor visit where Angela and defendant were scheduled to learn the gender of their unborn child.

Lori's mother, Joyce Tamarrino, testified that Lori described an argument she had with defendant in March 2009.  Lori said defendant told her, "I hate you, bitch.  You'll never see your grandson again.  I hope you die."  Lori responded by

calling defendant a sociopath. Joyce observed defendant on subsequent occasions stating that he hated Jeffrey and Lori and he hoped they would die.

In April 2009, defendant became angry because Jeffrey was towing a non-working car from defendant's Countryside home. Although Jeffrey had given the car to Angela, defendant took offense because he had spent money on the car. Angela testified that defendant shoved Jeffrey, pulled a switchblade, and said, "I am going to fucking kill you. I fucking hate you." The police arrived shortly thereafter and restrained defendant. No arrests were made.

In May 2009, Joyce held a party to celebrate Nicholas's three-month birthday. Angela testified that defendant insisted on going to the party and would not let her go alone. At one point, defendant saw Lori holding Nicholas and became upset. Defendant grabbed Nicholas, forcefully placed him in his baby carrier, and left the party. As defendant was leaving, he struggled over the baby carrier with Lori and Joyce, both of whom sustained bruises during the incident. The police were called to the party, but made no arrests.

*Jacob Nodarse*

Although he had never seen a psychologist or psychiatrist during his youth, Nodarse testified that he had been depressed since the fifth grade. He explained that his parents were strict Jehovah's Witnesses. As a child, Nodarse was not allowed to be involved in extracurricular activities due to the bad influences from people of other faiths. His parents would throw away many of his possessions, such as CD's and DVD's. This led to friction between Nodarse and his parents, and "an abusive and hostile environment." He testified that his parents would beat him, which led him to begin cutting himself with a knife. He began smoking marijuana and drinking alcohol during his junior year in high school. He moved away from home during his senior year of high school, and his parents and younger sister subsequently moved to Fort Myers, Florida.

In fall 2005 Nodarse was working as a technician at a BMW dealership and taking classes at a community college. He moved into an apartment with his friends, Joe Jereb and Jake Guziec. Nodarse described the apartment as a "party house," with at least 20 people present on any given night. Nodarse began smoking marijuana "almost every day" and drinking alcohol "probably five out of seven days a week." He was prescribed Vicodin after suffering a bacterial infection and mononucleosis in 2007. After he recovered, he began purchasing Vicodin illegally, which had a "snowball effect" progressing to stronger medications. He began using Percocet, Oxycontin, methadone, hydromorphone, and eventually, heroin. At first, the drugs alleviated his severe depression and anxiety; they were "almost a magical solution."

Nodarse began seeing a psychiatrist for depression in late summer 2009. He had recently learned that his younger sister had been raped. Two of his close friends had recently died. His girlfriend of two years, Samantha Mercado, described Nodarse as being smart, but testified that she thought he was depressed and he needed help. In fall 2009, Nodarse walked in on Mercado having sex with

Jereb. It became common knowledge among Nodarse's friends that Jereb had slept with Mercado. Nodarse nevertheless continued living in the apartment.

*Nodarse and Defendant*

Nodarse met defendant in early summer 2009. He soon began purchasing drugs from defendant, including Vicodin, Oxycontin, and heroin. By fall 2009, Nodarse had become friends with defendant and frequently accompanied him to bars and restaurants. Defendant said he was part of a criminal organization and had connections to powerful criminals. He claimed his organization received payouts from casinos and committed crimes such as extortion and murder, in addition to dealing drugs. He said that members of the organization had to commit a murder before they could be initiated.

Nodarse testified that defendant introduced him to men named Mitch, Tony, Dino, and Frank, each of whom defendant claimed were part of his organization. Defendant described Mitch as his "right-hand man." Tony handled defendant's distribution of narcotics. Dino ran his own crew and had a similar rank as defendant. Frank was an older man who had a high rank and a lot of authority. Defendant made it clear that Nodarse was never to discuss any aspect of the criminal organization with any of these men.

Defendant also told Nodarse of people who had "put in a fair amount of work" for the organization, meaning that they had killed several people. These included men named John and Vito, as well as a bouncer at a bar named "Capri," where high-ranking members of the organization frequently met. These discussions always took place while defendant and Nodarse were alone in a car.

Soon after they met, Nodarse and defendant realized that they shared a mutual acquaintance: Michael Kramer. Michael was one of the regular attendees at the apartment that Nodarse shared with Jereb and Guziec. Nodarse had known Michael for approximately four years, describing him as a good friend. When defendant realized that Nodarse and Michael were friends, defendant explained to Nodarse that he was dating Angela and he did not get along with Michael. Nodarse was instructed not to tell Michael of his friendship with defendant. Michael eventually became suspicious regarding Nodarse's source of drugs and asked him whether he knew defendant. Nodarse lied and said he did not.

*Thanksgiving 2009*

The State presented extensive evidence and testimony that defendant and Michael had a heated argument the night before Thanksgiving 2009. Nodarse testified that he and Michael were drinking at Nodarse's apartment late Wednesday night and into Thursday morning. At one point, Nodarse confessed that he knew defendant and apologized for previously claiming otherwise. Michael went on a profanity-laced rant and claimed that defendant had abused Angela.

Defendant called Nodarse's phone later that night. Michael asked Nodarse who was calling and threatened to fight him if he did not hand over the phone. Nodarse gave the phone to Michael, who then cursed at defendant, threatened to

4

shoot him in the head, and stated that he was going to help Angela raise Nicholas. Before ending the conversation, Michael told defendant, "[a]nd feel free to come over here. I'm going to kill your ass." Nodarse subsequently spoke with defendant on the phone, describing him as being "irate." Defendant told Nodarse that he was armed and speeding toward Nodarse's apartment, adding that he was going to kill Michael. Nodarse estimated that he heard Michael and defendant both threaten to kill each other about 30 times that night.

Angela testified that she was at the Countryside home alone with Nicholas on the night before Thanksgiving 2009. She said Nicholas was "very sick" with a "103, 104 fever." Defendant was out and Angela did not know where he was. She was awakened early Thursday morning by a phone call from Michael, describing him as "upset" and "angry." Defendant called Angela between 5 and 10 minutes later. He told Angela that he was "heading to where Michael is right now" and "[Michael] better watch it." At around 5:00 a.m., defendant arrived at the Countryside home with Nodarse. Defendant instructed Nodarse to tell Angela about Michael's threats.

Nodarse testified that he was kicked out of his apartment with Jereb and Guziec after the Thanksgiving incident. Defendant arranged for Nodarse to rent a Countryside apartment from his uncle, Greg Georgevich. Defendant said that Georgevich knew of his illegal activities, but told Nodarse not to discuss the topic with him. Nodarse's roommate at the Countryside apartment was Graham Morenz, a fellow employee at the BMW dealership.

*Defendant and Angela Separate*

Tensions escalated between defendant and Angela during December 2009 and January 2010. Angela testified that defendant would not allow her to take Nicholas to the Kramer family's Darien home on Christmas day. Angela and defendant argued through the next day, as Angela threatened to move out of the Countryside home if defendant could not start getting along with her family. Defendant said he did not care if Angela left, but he was keeping Nicholas, adding that Angela would be seeing her family "in body bags." The two eventually reached an informal agreement to split custody of Nicholas, and Angela moved into the Kramer family's Darien home.

Angela continued to live in the Darien home during the following weeks, despite defendant's repeated requests that she [] move back to the Countryside home. On December 31, 2009, she and Lori met with attorney Anique Drouin for an initial consultation regarding legal custody of Nicholas. Angela was scheduled to pick Nicholas up from the Countryside home on January 13, 2010. The night before, defendant had called Angela and threatened to throw her things to the street if she did not move back to the Countryside home. Angela arrived at the Countryside home the next day to find many of her belongings outside in the driveway. She said defendant was being loud and profane, and he continued to throw her belongings out of the house. Angela began recording a video of the incident on her cell phone. The video was admitted and played for the jury. After

5

leaving the Countryside home, Angela went directly to Drouin's office to file for sole legal custody of Nicholas.

On January 14, 2010, Lori Kramer spoke with Evelyn Hanley, the facilities manager at her place of employment. Hanley testified that Lori said Angela was involved in a custody dispute, and Lori was concerned for her safety because defendant knew where she sat at work and he "might come pay her a visit at the office." She said defendant had "been combative, and he would make her family miserable in the child custody process." Lori sent Hanley an email that same day detailing her concerns, with a picture of defendant attached. The email stated that defendant had made threats toward the Kramer family and requested that defendant not be allowed past security. Hanley forwarded the email to the company's security department. A copy of the email was admitted into evidence.

*Evidence of Accountability and Solicitation*

Nodarse testified that defendant began cultivating the motive for the killings as his relationship with Angela deteriorated. Defendant told Nodarse that Angela had given the police information about several of his criminal associates and their illegal activities. The members of defendant's organization were upset because Angela knew more than she was supposed to have known. They believed Angela acquired this information from Nodarse because of Nodarse's friendship with Michael. In addition, defendant explained that his associates had been questioning Nodarse's involvement with the criminal organization. Defendant had taken the liberty of vouching for Nodarse's initiation, meaning the members of the organization believed that Nodarse had committed a murder.

Defendant also claimed he had an "informant" who had been spending time at Nodarse's old apartment. According to the informant, Michael had been discussing his desire to kill Nodarse to prevent him from testifying during Angela's custody proceeding, as Nodarse would be a "key witness" regarding the Thanksgiving incident.

These conversations escalated through February 2010, as defendant claimed the members of his criminal organization were increasingly upset with Michael and Angela. Defendant supported his claim that Michael and Angela were giving the police information by showing Nodarse some papers relating to the custody dispute. Nodarse testified that the papers had an official heading and contained a list with several names. Nodarse recognized his name, as well as several of defendant's criminal associates. Defendant said Michael and Angela had already helped the police find drugs in a vehicle belonging to his associate, John. As a result, John's children were taken into foster care. Defendant had been ordered to either kill Angela and Michael himself, or have Nodarse do the job. Defendant explained, however, that he would not be able to get away with the murders because the custody dispute gave him an obvious motive.

Defendant said his criminal associates were also threatening to harm Nodarse's family if Angela and Michael were not killed. Defendant had a printout from Nodarse's sister's Facebook page. He said John had sent him the printout and

commented that Nodarse's sister was "very pretty" and "he would be interested in her." Defendant knew that Nodarse's sister had previously been raped.

Defendant also repeatedly mentioned the threats from Michael, eventually claiming that Michael had gathered enough money to hire someone to kill Nodarse. On February 20, defendant called Nodarse and told him Michael had arranged to kill him that night. Nodarse armed himself with knives and spent the night waiting in his kitchen with the lights off and the blinds drawn. Defendant warned Nodarse that he would be killed if he went to the police, adding that he would find out because he had connections with several police officers.

On February 22, at defendant's urging, Nodarse purchased a handgun for his own protection. He picked up the handgun and some magazines on February 25, following a three-day waiting period. He quit his job at the BMW dealership that same day, telling co-workers that people were trying to kill him. He told defendant that he was going to Florida, where his family lived, so he could protect them. Defendant told Nodarse that this would be useless; John was a professional that would inevitably find Nodarse's family and rape his sister. Defendant said the only other option was to kill Michael and Angela.

Nodarse testified that defendant helped devise the plan to kill the Kramers. On the night of February 25, defendant took Nodarse to the back yard of the Kramers' Darien home. Defendant described the layout of the Kramer house. He told Nodarse to kick in a door or break a window to get into the house. Once Nodarse was in, he would be committed: he was to kill Angela, Michael, Jeffrey, and Lori, making sure to shoot each of them in the head. Defendant told Nodarse to check the rooms upstairs and make sure that no one was hiding in the closets. He told Nodarse to wear latex gloves underneath a second pair of gloves, along with a mask and three layers of clothing. He gave Nodarse a pair of over-sized shoes that belonged to his associate [Dino] Dion, which Dion had left in defendant's car. He told Nodarse to stuff tissue paper in the end of the shoes and wear them while he was in the Kramer home.

Nodarse would tell people that he was leaving for Florida on Sunday, February 28, at which point he would suspend all contact with defendant. He would delete all of his text messages and render his phone untraceable. He would stay somewhere in the area, unnoticed, until early Tuesday morning, March 2. He would kill the Kramers at precisely 3 a.m. Defendant would be in a bar with surveillance cameras while Nodarse was killing the Kramers. Defendant's associate, John, would be killing the social worker who had taken his children. At 4 a.m., defendant would kill the Kramers' cousins, who were gang-affiliated, to prevent them from striking back in retaliation. Nodarse would drive directly to Florida after killing the Kramers.

Nodarse could not sleep during the following days because he was paranoid and afraid. He wrote a suicide note to his family, which was admitted into evidence. He gave defendant a list of phone numbers for people whom defendant promised to protect in case anyone sought revenge. He went out to a bar with defendant on the evening of February 27. Defendant pulled him aside at one point during the night and told him that everything was "still on as planned."

*March 2, 2010*

Nodarse testified that he began taking a large amount of drugs on March 1. By the early hours of March 2, he had taken 10 Vicodin pills, 2 Adderall pills, Klonopin, and sleeping medication. He became disoriented and felt as though he was dreaming. As he left his apartment, dressed according to defendant's instructions, he could not distinguish between reality and a dream. He mistakenly drove to his old apartment before proceeding to the Kramer house. Just before 3 a.m., he approached the house with his loaded gun and a hammer. He had visions of his sister being injured and he could hear her screaming. He testified, "it came in my mind that this is something I had to do to save my family. And I gathered up as much courage as I could and I broke the window."

As he entered the house, Nodarse first saw Michael on the couch watching television. He fired a stray shot at Michael, who ran into the kitchen. Nodarse turned to his right, saw Jeffrey, and shot him in the torso. He noticed Lori coming down the stairs and he shot her in the torso as well. Nodarse walked to Jeffrey and Lori and shot them each in the head, just as defendant had instructed. He then looked for Michael and found him holding a steak knife in the kitchen. He fired a shot into Michael's torso, and then shot him in the head. Nodarse checked upstairs for Angela, but he could not find her; he did not check the bedroom closets. He quickly left the Kramer home and went to his car, which he had left running.

Nodarse was driving south through Indiana when the sun started to rise. He became very nervous and started having flashbacks. He pulled over and vomited on the side of the road, still uncertain as to whether he had been dreaming. He realized that he had committed the murders after determining that he had spent rounds of ammunition. He drove to a restaurant in Terre Haute, Indiana, and parked near a dumpster. He put his handgun, ammunition, mask, shoes, gloves, and outer layers of clothing in a black garbage bag. He placed the bag into the dumpster and proceeded driving southbound toward Florida.

While in Georgia, Nodarse called 911 because he believed undercover police cars were harassing him. A recording of that conversation was admitted into evidence and played for the jury. Nodarse also attempted calling defendant, but defendant did not answer. He was able to contact Guziec, who testified that Nodarse was "freaking out," and he thought "almost all the vehicles around him were cops." Guziec told Nodarse that something had happened, explaining that Michael and his parents might not be alive. Nodarse paused and responded that he and Guziec might not get another chance to talk. Nodarse also mentioned that he had written a letter for his sister and he was going to Florida to protect her. Guziec called the police after Nodarse hung up.

*Aftermath*

Nodarse made contact with his parents, who met him in Tampa Bay and drove him to Fort Myers. He fell asleep along the way. He woke up to the sound of a U.S. Marshal tapping his gun on the car window. Nodarse was taken into custody and interviewed twice on March 4. He was then flown back to Chicago

and interviewed at the Darien police station on March 6. The videos of these interviews were admitted and played for the jury as prior consistent statements. While there were minor discrepancies between Nodarse's statements during the interviews and his trial testimony, he was generally consistent in his representations that defendant led him to believe he and his family members were in danger. He was also consistent in his statements that defendant was instrumental in devising the plan to kill the Kramers.

Defendant called 911 just before 7 a.m., on March 2, and asked to speak with a police officer. Willow Springs police officer Bobby Sims met with defendant. Sims testified that defendant said he did not feel safe because he recognized the Kramers' home on televised news reports and he feared his son's mother was dead. Defendant voluntarily accompanied officers to the Darien police station. On the way, defendant said he had been at a casino during the previous night and he had nothing to do with the murders. At trial, the State admitted surveillance videos showing that defendant was at a Joliet casino with his brother, Boris, from approximately 10:30 p.m. to 3:45 a.m. At approximately 3:26 a.m., defendant went out for a cigarette break and had a conversation with Guilia Wuttke, who testified that defendant appeared nervous and repeatedly checked his phone.

Defendant was later arrested and placed in a holding cell next to Nodarse. The two had several conversations on March 5 and 6. Recordings of those conversations were admitted and played for the jury. Defendant repeatedly asked Nodarse if he had spoken with police. He also asked if Nodarse wore gloves and disposed of the gun, claiming his lawyer told him the police had recovered finger prints and a gun.

*Nodarse's Mental State*

Clinical psychologist Dr. John Murray testified as an expert witness for the State. He conducted 10 interviews with Nodarse, in addition to reviewing Nodarse's interviews with law enforcement. He found Nodarse to be credible, stating that Nodarse's story was consistent with what he had said during the interviews in the days following the murders. Dr. Murray estimated Nodarse's intelligence to be "at least average, probably higher." He opined that Nodarse was fit to stand trial with medication, and that, although Nodarse was experiencing symptoms of a mental illness at the time of the murders, those symptoms were not so severe that Nodarse was not responsible for his actions. He diagnosed Nodarse with bi-polar disorder, a severe mood disorder, which was linked to major depressive episodes that he had experienced during his life.

Du Page County jail staff psychiatrist Dr. James Corcoran testified on behalf of defendant. He had interviewed Nodarse 48 times. On April 30, 2010, Nodarse told Dr. Corcoran that he sometimes heard voices. Dr. Corcoran had interpreted this as a possible auditory hallucination, and he was concerned at the time that Nodarse might be developing some psychotic symptoms. Dr. Corcoran admitted on cross-examination that he did not document the incident as an auditory hallucination, due largely to the possibility that Nodarse could have been suffering

residual symptoms from his prior substance abuse.  Dr. Corcoran never diagnosed Nodarse as being psychotic.

Forensic psychiatrist Dr. Mark Mills also testified on behalf of defendant. In his opinion, Nodarse was intermittently psychotic in and around the time of the killings.  This meant Nodarse "was manifesting significant symptoms of hallucinations, of delusions, of lack of contact with reality, of problems with thinking."  Although Dr. Mills never interviewed Nodarse, he came to his conclusion by studying Nodarse's videotaped interviews with investigators, the audiotapes of Nodarse and defendant in the holding cells, and reports from several psychologists who had interviewed Nodarse.  Dr. Mills did not think Nodarse had a broad period of psychosis until the weeks leading up to the killings.

*Verdict*

The jury found defendant guilty of the first-degree murders of Jeffrey Kramer, Lori Kramer, and Michael Kramer, as well as solicitation of the murder of Angela Kramer.

2015 IL App (2d) 130736-U, ¶¶ 4-53 (subheadings italicized and subheading labels omitted).

## B.      Post-Trial Motion and Direct Appeal

Borizov filed a motion for a new trial in which he raised 31 claims of error.  (Mot. New Tr., St. Ct. R., Ex. G (Dkt. No. 74-7), at 9-16.)[2]  The trial court denied the motion and sentenced Borizov to three consecutive terms of natural life in prison for the murders and a consecutive 30-year sentence for soliciting Angela's murder.  *See People v. Borizov* (*Borizov II*), 2019 IL App (2d) 170004, ¶ 3.

Borizov then filed a direct appeal to the Illinois Appellate Court.  In that appeal, Borizov's sole contention was that he was deprived of a fair trial due to a pervasive pattern of prosecutorial misconduct, namely, introducing irrelevant and prejudicial evidence for the purpose of showing the jury that he was a bad person, as well as making numerous "objectionable comments" during closing and rebuttal arguments.  (Direct Appeal Br., St. Ct. R., Ex. B (Dkt. No. 74-2), at 23-47.)

---

[2]      We have utilized the ECF pagination for the citations to Borizov's motion for a new trial and brief on direct appeal, the orders on the postconviction petition and postconviction petition for leave to appeal, and the trial transcript.

On November 12, 2015, the Illinois Appellate Court issued an opinion affirming Borizov's conviction. 2015 IL App (2d) 130736-U. The court held that several of the evidentiary issues were not properly preserved, and as to the preserved ones, the trial court did not abuse its discretion in allowing the evidence. *Id.* ¶¶ 58-74. The court also held that although the prosecution made four improper comments in its closing argument, they did not amount to a pervasive pattern of misconduct or constitute a material factor in Borizov's convictions. *Id.* ¶¶ 76-124.

Borizov renewed his claims in a Petition for Leave to Appeal ("PLA"), which the Illinois Supreme Court summarily denied on March 30, 2016. (Direct Appeal PLA & Denial Order, St. Ct. R., Ex. F (Dkt. No. 74-6).)

## C.    Postconviction Proceedings

In October 2016, Borizov filed a pro se postconviction petition in which he stated that he had raised 31 issues in his motion for a new trial, "many of which were significant," and appellate counsel was ineffective for failing to "raise issues that were objected to at trial[] and filed in the Motion for New Trial." (Postconviction Pet., St. Ct. R., Ex. G (Dkt. No. 74-7), at 2.) Borizov did not elaborate. The trial court dismissed the petition on the grounds that Borizov's claim was "non-specific, bald and conclusory" and he had failed to specify how he had been prejudiced by any alleged error of appellate counsel. (Order on Postconviction Pet., *id.* at 24-28.)

Borizov, through counsel, appealed the trial court's dismissal of his petition for postconviction relief. At this level, he asserted that appellate counsel was ineffective for failing to argue that one of the jurors suffered from an implied bias. (Postconviction Appeal Br., St. Ct. R., Ex. H (Dkt. No. 74-8).) The Illinois Appellate Court issued an opinion affirming the dismissal. *Borizov II*, 2019 IL App (2d) 170004. Borizov then filed a PLA to the Supreme Court of Illinois, reiterating the ineffective assistance claim relating to juror bias. (Postconviction PLA, St. Ct. R.,

Ex. L (Dkt. No. 74-12).)  The Illinois Supreme Court summarily denied the PLA on March 25, 2020.  (Order on Postconviction PLA, *id.* at 24.)

## D.    Federal Habeas Petition

In August 2020, Borizov filed a pro se federal habeas corpus petition, asserting claims of prosecutorial misconduct, ineffective assistance of appellate counsel, and juror bias.  (Dkt. No. 1.) After we denied Borizov's subsequent motions to stay the proceeding and for reconsideration of that denial, we granted Borizov's motion for leave to file an amended habeas petition to add new claims based on a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the prosecution's alleged use of perjured testimony.  (Order, Dkt. No. 48.)  At that time, we also stayed the proceeding so that Borizov could exhaust the two new claims before the Illinois courts by filing a successive postconviction petition.  (*Id.*)

Borizov sought assistance from an attorney, who, after investigating the viability of filing a successive postconviction petition in state court, informed Respondent's counsel that he had completed his investigation and would not be seeking leave to file such a petition.  (*See* Dkt. Nos. 54, 68.)  Thereafter, in December 2022, we lifted the stay and directed Respondent to answer the amended petition.  Respondent filed an answer.  (Dkt. No. 73.)  Borizov was given the opportunity to file a reply to the answer and several extensions of time in which to do so.  He has not filed a reply, nor did he request an extension of the most recent deadline, which was November 28, 2023, (Dkt. No. 85), so we proceed to a ruling on the amended petition.

## DISCUSSION

In his amended § 2254 petition, Borizov lists five grounds for relief:

1.     The prosecutor engaged in a pervasive pattern of prosecutorial misconduct, specifically in (a) improper closing arguments and (b) the introduction of improper and prejudicial character evidence for the purpose of depicting Borizov as a "bad person."

2. Appellate counsel was ineffective for failing to raise all issues that were presented in Borizov's motion for a new trial, including the claim of juror bias.

3. Juror #189 suffered from implied bias.

4. The prosecutor withheld evidence about the State's key witness (Nodarse) in violation of *Brady*.

5. The prosecutor used Nodarse's perjured testimony to convict Borizov.

(Am. Pet. (Dkt. No. 43), at 5-6(A).) For clarity, we will follow Respondent's lead in referring to the portion of Claim 2 that alleges ineffective assistance with regard to juror bias as Claim 2(a) and the portion of Claim 2 that alleges ineffective assistance with regard to the 30 other issues presented in Borizov's motion for a new trial as Claim 2(b).

Respondent contends that Borizov's claims are procedurally defaulted, meritless, and/or barred. (Answer at 23-46.) By failing to reply, Borizov waived any counterarguments. *See Webb v. Frawley*, 906 F.3d 569, 581 (7th Cir. 2018); *Alcaraz v. Pfister*, No. 19 C 1734, 2020 WL 4904566, at *3 n.3 (N.D. Ill. Aug. 20, 2020). But since Borizov is proceeding pro se, we fully address each of his claims below.

## A. Claims 2, 3, 4, 5, and Portions of Claim 1(b) Are Procedurally Defaulted

The doctrine of procedural default bars Claims 2, 3, 4, 5, and portions of Claim 1(b). A petitioner may procedurally default a claim in two ways. The first is by failing to fairly present a claim for "one complete round" of state court review—in other words, to the state trial court, the Illinois Appellate Court, and the Illinois Supreme Court, either on direct review or in postconviction proceedings. *Mata v. Baker*, 74 F.4th 480, 488 (7th Cir. 2023); *McGhee v. Watson*, 900 F.3d 849, 854 (7th Cir. 2018). A claim is fairly presented when the state court was supplied with the operative facts and controlling law and thus "sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis." *McDowell*

*v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013). The second way a claim is procedurally defaulted is when the state court relied on an independent and adequate state procedural rule to reject the claim. *Lee-Kendrick v. Eckstein*, 38 F.4th 581, 587 (7th Cir. 2022).

### 1. Claims Not Asserted Through One Complete Round of State-Court Review (Claims 2(b), 3, 4, and 5)

Claim 3, juror bias, was not presented at each level of the state-court system. Borizov did not raise it at all on direct appeal, and he did not fairly present it to the trial court that heard his postconviction petition in the first instance. Rather, in that petition he raised only a generalized claim of ineffective assistance of appellate counsel for failure to argue unspecified issues among the 31 raised in the post-trial motion, and he did not mention the juror-bias issue at all. Therefore, Claim 3 is barred as procedurally defaulted. *See Thomas v. Williams*, 822 F.3d 378, 384-86 (7th Cir. 2016).

Claim 2(b), in which Borizov alleges ineffective assistance of appellate counsel for failing to raise issues in his post-trial motion other than juror bias, is likewise procedurally defaulted because it was not presented in Borizov's postconviction appeal brief or ensuing PLA. Alternatively, procedural default bars review of Claim 2 in its entirety, including the portion of the claim that alleges ineffective assistance with regard to juror bias. Even with the liberal construction given to pro se pleadings, *McDowell*, 737 F.3d at 482, Borizov's postconviction petition failed to give the state trial court a meaningful opportunity to pass upon the substance of any claim for ineffective assistance of counsel. Borizov merely argued that his motion for a new trial had "raised 31 points, many of which were significant," and that appellate counsel was ineffective for failing to "raise issues that were objected to at trial, and filed in the Motion for New Trial." (Postconviction Pet. at 2.) He cited no facts or legal principles and did not specify which points in the motion for a new trial were "significant." To meet his burden of fairly presenting this

14

claim to the state trial court, Borizov had to do more than assert ineffective assistance in such a broad and conclusory manner. *See McGhee*, 900 F.3d at 854 (petitioner's faulting appellate counsel for failing to raise unspecified issues was inadequate to present an ineffective-assistance claim to the state appellate court); *Hicks v. Hepp*, 871 F.3d 513, 531-32 (7th Cir. 2017) (ineffective-assistance claim was not fairly presented to the state supreme court where petition contained only "vague and sparse references" to the claim and no supporting argument).

Claims 4 and 5, for violation of *Brady* and the use of perjured testimony, are procedurally defaulted for failure to raise them before the Illinois state courts at any point. Borizov did not present these claims on direct appeal or in his state postconviction proceedings. He concedes as much in his amended petition. (Am. Pet. at 6 ("The two amended claims: (1) *Brady* violation; and (2) use of perjury[,] have not been presented or exhausted in the state court, as Petitioner only recently obtained evidence to support [the] claims.").) And after we stayed this action to allow Borizov to exhaust Claims 4 and 5 before the Illinois courts by pursuing a successive postconviction petition, in the end he did not seek leave to file such a petition. Because Claims 4 and 5 were not exhausted in state court, they are procedurally defaulted. *See Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004) ("[W]hen the habeas petitioner has failed to fairly present to the state courts the claim on which he seeks relief in federal court and the opportunity to raise that claim in state court has passed, the petitioner has procedurally defaulted that claim."); *Alcaraz*, 2020 WL 4904566, at *4 (holding that a *Brady* claim was procedurally defaulted when the petitioner admitted that he did not raise the issue in state court and ultimately failed to file a successive state-court petition or an explanation as to why he failed to do so).

2.      **Claims Rejected on an Independent and Adequate State-Law Ground (Claim 2(a) and Portions of Claim 1(b))**

In Claim 2(a), Borizov contends that his counsel on direct appeal was ineffective for not raising the juror-bias claim.  Borizov raised this claim before the Illinois Appellate Court, which rejected it on the ground that it did not comply with the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-2, which requires a petition to "clearly set forth the respects in which petitioner's constitutional rights were violated." *Borizov II*, 2019 IL App (2d) 170004, ¶ 20.  Rather, Borizov had "placed the burden on the trial court to parse through all the claims listed in the motion for a new trial, without specifying which claims counsel should have raised." *Id.*  Borizov's failure to satisfy Illinois's procedural requirements for obtaining relief on a postconviction claim was an independent and adequate state-law ground that precludes federal habeas review of the claim. *See Turner v. Mueller*, No. 16 C 10237, 2019 WL 3716930, at *6 (N.D. Ill. Aug. 7, 2019) (collecting cases) (claim was procedurally defaulted due to state court's reliance on the independent and adequate ground that petitioner had failed to go beyond conclusory, unsupported statements).

In Claim 1(b), Borizov contends, as he did on direct appeal, that the prosecution engaged in misconduct by introducing "improper and very prejudicial evidence to depict" him as a "bad person."  (Am. Pet. at 5.)  Borizov raised five evidentiary challenges before the Illinois Appellate Court.  (Direct Appeal Br. at 34-43.)  The court rejected two of them—challenges to the prosecution's introduction of evidence regarding (1) Borizov and Angela's son, Nicholas, having been ill with a high fever on the night before Thanksgiving 2009, and (2) Borizov's cell phone having contained contacts for police officers—on the ground that they were not properly preserved and therefore forfeited because there were no objections at trial.  2015 IL App (2d) 130736-U, ¶¶ 72-73.  The court further concluded that the two evidentiary issues were not reviewable under either prong of the plain-error analysis.  *Id.* ¶ 74.  The application of forfeiture and the

16

determination that plain error did not excuse it is an independent and adequate state-law ground of decision, so the portions of Claim 1(b) pertaining to Nicholas's illness and phone-contacts evidence are procedurally defaulted, and habeas relief is thus barred. *See Kaczmarek v. Rednour*, 627 F.3d 586, 591-93 (7th Cir. 2010); *Madden v. Melvin*, No. 17 C 724, 2017 WL 11516829, at *2 (N.D. Ill. Oct. 3, 2017).

### 3. Exceptions to Procedural Default Do Not Apply

A habeas petitioner can overcome procedural default by showing either (1) cause for the default coupled with resulting prejudice, or (2) that federal relief is needed to prevent a fundamental miscarriage of justice. *Hicks*, 871 F.3d at 531; *Tabb v. Christianson*, 855 F.3d 757, 765 (7th Cir. 2017) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). But Borizov presents no argument that he can satisfy either exception. Therefore, he forfeits the argument, and there is no basis to excuse his procedural default.[3] *See Hicks*, 871 F.3d at 765.

In Claims 4 and 5, Borizov does cite (without explanation) and submit brief handwritten statements that are labeled as the declarations of two fellow inmates at Stateville. (Am. Pet. at 6-6A & Exs. A & B.) The statements contain extremely vague hearsay to the effect that Nodarse told these inmates some time in 2019 that he "lied on" Borizov. (*Id.*, Exs. A & B.) To the extent that Borizov may be relying on these exhibits in an attempt to overcome the procedural default of Claims 4 and 5 through the "miscarriage of justice" exception, he misses the mark. The exception applies to the "extremely rare" case where a petitioner is actually innocent of the crime for which he is imprisoned, and it requires a presentation of new *reliable* evidence tending to support such an argument that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 321-27 (1995) (stating

---

[3]     Given our determinations that Claims 2(a) and 3 are procedurally defaulted and there is no basis to excuse the default, we need not reach Respondent's argument in the alternative that they are barred by *Teague v. Lane*, 489 U.S. 288, 301 (1989). (Answer at 43-46.)

that a petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence); *Dixon v. Williams*, 93 F.4th 394, 2024 WL 687251, at *5-6 (7th Cir. Feb. 20, 2024). For one thing, the statements Borizov submits do not remotely suggest that the prosecution withheld *Brady* material or suborned perjury. Furthermore, they are neither compelling nor reliable and consequently fail to approach the stringent *Schlup* standard or merit an evidentiary hearing. *See, e.g., Carlos v. Williams*, No. 14 C 1263, 2015 WL 5009354, at *10 (C.D. Ill. Aug. 24, 2015) (in assessing reliability, "identity matters"; testimony from new witnesses with no evident motive to lie stands in contrast to testimony from "inmates, suspects, or friends . . . of the accused"); *United States ex rel. Brisbon v. Fry*, No. 000, 2004 WL 1244123, at *5 (N.D. Ill. June 7, 2004) (inmate affidavits submitted in connection with the "miscarriage of justice" exception "are not uncommon and experience has shown that they are to be treated with a fair degree of skepticism").

**B.    The Remaining Portions of Claim 1(b) Are Meritless**

As we observed above, Borizov asserts that the prosecutor committed misconduct by introducing certain evidence for the purpose of depicting Borizov as a bad person. On Borizov's direct appeal, the Illinois Appellate Court considered the merits of the three evidentiary challenges in Claim 1(b) that are not defaulted.

The Antiterrorism and Effective Death Penalty Act bars federal habeas relief for claims adjudicated on the merits in state court unless the state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Shirley v. Tegels*, 61 F.4th 542, 545 (7th Cir. 2023) (quoting 28 U.S.C. § 2254(d)(1)). "This deferential standard reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error

correction through appeal." *Id.* (citation and internal punctuation omitted). Thus, habeas relief is precluded unless a petitioner demonstrates that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). A federal court cannot issue a habeas writ that rests on a belief that a state court misunderstood or misapplied state law. *Ruhl v. Hardy*, 743 F.3d 1083, 1098 (7th Cir. 2014) (citing, *inter alia*, *Waddington v. Sarausad*, 555 U.S. 179, 192 n.5 (2009)).

The three non-defaulted portions of Claim 1(b) are challenges to the prosecution's introduction of evidence regarding (1) the death of Angela's former boyfriend, Steve Hetman; (2) a hearsay statement made by Georgevich, Borizov's uncle, to one of Nodarse's coworkers; and (3) Borizov's affiliation with the Latin Kings gang. As to Hetman, the prosecution had commented during opening statements that Borizov had "asked out his dead best friend's girlfriend" within "a few months" of Hetman's death. (Trial Tr., St. Ct. R., Ex. A (Dkt. No. 74-1), at 108.) Later, the prosecution briefly questioned Angela about Hetman's death and the ensuing start of Angela and Borizov's relationship, and defense counsel objected. (*Id.* at 250-51.) The trial court allowed the evidence "[j]ust for the time line of events." (*Id.* at 251-52.) Hetman's death was not mentioned by other witnesses or during closing arguments. While the appellate court agreed with Borizov that the State could have established a timeline of events without discussing the timing of Hetman's death, it held that the trial court did not abuse its discretion in allowing the evidence because the relationship between Angela and Borizov was at the center of the case and there had been no objection to Angela's testimony that Hetman was her former boyfriend. 2015 IL App (2d) 130736-U, ¶ 62. The court concluded that it was therefore not unreasonable for the trial court to allow evidence regarding the timing of Hetman's death insofar as it pertained to the beginning of Angela

19

and Borizov's relationship, especially considering that the trial court limited the likelihood that the probative value of the evidence would be outweighed by the danger of unfair prejudice to Borizov by warning the prosecution not to emphasize the timing, and the prosecution heeded that admonition. *Id.*

The next challenge was to the prosecution's introduction of testimony about an out-of-court statement made by Georgevich. There was evidence that after Thanksgiving 2009, Borizov helped Nodarse rent an apartment from Georgevich. Nodarse shared the apartment with Graham Morenz, a coworker at the car dealership. On direct examination, the prosecution asked Morenz if he had had any conversations with Georgevich after the Kramers were killed. The trial court sustained defense counsel's hearsay objection but on redirect permitted Morenz to answer the same question after overruling defense counsel's objection that it was beyond the scope of cross-examination. (Trial Tr. at 1812, 1825-36.) Morenz answered that Georgevich told him "not to let the police search the apartment without a search warrant." (*Id.* at 1836.) Borizov argued on appeal that the statement was hearsay, irrelevant, and prejudicial, serving only to show the jury that his family was hiding something. 2015 IL App (2d) 130736-U, ¶ 64. The appellate court agreed that the statement was hearsay[4] but determined that the trial court did not abuse its discretion in allowing it. *Id.* ¶¶ 65-66. Defense counsel had opened the door to the statement by asking Morenz questions on cross-examination to establish that Georgevich was not doing favors for Borizov, and the prosecution on redirect was attempting to counter the defense's implication that Borizov was not the "master" of Nodarse; under those circumstances, the court explained, the trial court's ruling was not "arbitrary, fanciful, or unreasonable." *Id.* ¶ 66.

---

[4] On this point, we respectfully disagree with the state court; a command is not hearsay because it is not an assertion of fact. *See, e.g.*, *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir. 2017). Nevertheless, our conclusion in this respect does not assist Borizov.

Borizov also challenged the prosecution's introduction of evidence that Borizov had obtained drugs from the Latin Kings street gang. Nodarse testified that he purchased his drugs from an individual named Henry Prucha before he began purchasing them from Borizov and that he had met Borizov for the first time at Prucha's house. Prucha had testified earlier before a grand jury that the Latin Kings were Borizov's primary source of drugs. The trial court permitted Prucha to testify that Borizov's source was a street gang but ruled that Prucha could not specifically mention the Latin Kings. Later, on cross-examination of Borizov's psychiatric expert, Dr. Mark Mills, however, the prosecution sought to discredit Mills's opinion that Nodarse was intermittently psychotic and hallucinating at the relevant time by confronting him with Prucha's grand jury testimony, in order to show that Nodarse did not misperceive Borizov's representations that he was involved with the Latin Kings. After defense counsel objected on the ground that the court had previously barred the reference, the trial court observed that defense counsel earlier had agreed to play videotaped interviews of Nodarse that contained a number of references to the Latin Kings. (Trial Tr. at 3208-10.) Those videos were played prior to Dr. Mills's testimony, so evidence about the Latin Kings had already been presented to the jury. The trial court overruled the objection on the ground that Prucha's grand jury testimony that the Latin Kings were a source of Borizov's drugs was relevant to Nodarse's claim that Borizov had told him about his criminal involvement, and there were conflicting expert opinions about the credibility of Nodarse's testimony on the topic of his communications with Borizov. (*Id.* at 3210-13.) On appeal, Borizov argued that the prosecution's questions were an attempt to "back door" evidence that was previously excluded. The appellate court disagreed, explaining that Prucha's testimony supported Nodarse's claim that he was convinced of Borizov's criminal stature, and because the jury had previously heard

Nodarse's multiple references to the Latin Kings, the probative value of Prucha's testimony outweighed the danger of any unfair prejudice to Borizov. 2015 IL App (2d) 130736-U, ¶¶ 69-70.

As to each of Borizov's three non-defaulted evidentiary challenges, the Illinois Appellate Court held that under Illinois law, the evidence was not erroneously introduced by the prosecution or admitted by the trial court. *Id.* ¶¶ 58-70 (citing Ill. R. Evid. 401, 403, & 801(c) and *People v. Caffey*, 205 Ill.2d 52, 89 (2001) (applying an abuse-of-discretion standard to evidentiary rulings). Respondent contends that Borizov "cannot challenge" these determinations because the rulings turned on state law, (Answer at 43), but that is incorrect. It is true that in the context of a habeas petition we do not review the rulings as a matter of *state* law, but, as the Seventh Circuit has explained, we can consider a state court's evidentiary rulings when they implicate a *federal* constitutional question. *Fieldman v. Brannon*, 969 F.3d 792, 800 (7th Cir. 2020). It is nonetheless rare for a "[r]un-of-the-mill" error of state law to "provide a basis for federal habeas relief" because a petitioner must show that the state court rendered its merits decision "in violation of the Constitution or laws or treaties of the United States." *Id.* (citing 28 U.S.C. § 2254(a)); *see also Ruhl*, 743 F.3d at 1098 ("In essence, Ruhl asks us to overturn the Illinois Appellate Court's determination that the statements were admissible under Illinois law. As a general rule, this is not something we can do. Only in very rare cases where the state court's resolution of the evidentiary dispute was clearly unreasonable or otherwise implicates federal constitutional rights has this court granted habeas relief on state law evidentiary questions.") (citations omitted).

Borizov invokes his Sixth and Fourteenth Amendment rights in Claim 1, but he does not develop any argument whatsoever as to how the state court's evidentiary rulings were contrary to or involved an unreasonable application of federal law pertaining to those rights or an unreasonable determination of the facts in light of the evidence, nor does he cite any law in support of this claim.

Case: 1:20-cv-04754 Document #: 90 Filed: 03/28/24 Page 23 of 35 PageID #:4585

Therefore, Borizov falls well short of demonstrating that the state court's thorough analysis of the evidentiary issues was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Richter*, 562 U.S. at 103; *see also Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (habeas relief is appropriate solely in "those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision-making about federal constitutional claims"). Very little trial time was spent on the challenged evidence, all of which was peripheral to the central facts of the case, and nothing in the record suggests that its introduction and admission resulted in a violation of due process or any of Borizov's constitutional rights. Accordingly, he is not entitled to habeas relief on Claim 1(b).

## C.      Claim 1(a) Is Meritless

In Claim 1(a), Borizov asserts that several statements made by the prosecution in closing argument deprived him of his Sixth and Fourteenth Amendment rights. On direct appeal, the Illinois Appellate Court discussed the prosecution's remarks in detail and held that although four of them were improper, they did not play a material role in Borizov's convictions because the evidence was not closely balanced, and they did not create a pervasive pattern of misconduct that resulted in unfair prejudice. 2015 IL App (2d) 130736-U, ¶¶ 76-124.

*Darden v. Wainwright*, 477 U.S. 168 (1986), provides the clearly established federal law for Borizov's claim of prosecutorial misconduct.[5] *See Evans v. Jones*, 996 F.3d 766, 774 (7th Cir. 2021). "Under *Darden*, a prosecutor's improper statements deprive a criminal defendant of his

---

[5]      Although the Illinois Appellate Court did not cite *Darden*, the court correctly articulated its standards when considering Borizov's claim that the prosecution's comments deprived him of a fair trial. 2015 IL App (2d) 130736-U, ¶ 78. It then applied the standards by first evaluating whether the prosecution's comments were improper, concluding that four of them were, and proceeding to examine whether Borizov was prejudiced as a result. *Id.* ¶¶ 82-124.

23

right to a fair trial if the remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Darden*, 477 U.S. at 181); *see also Bell v. Hepp*, 70 F.4th 385, 390 (7th Cir. 2023). A defendant seeking relief under *Darden* embarks on an "uphill battle," for improper statements during closing arguments "rarely constitute reversible error." *Evans*, 996 F.3d at 775 (quoting *United States v. Klemis*, 859 F.3d 436, 442 (7th Cir. 2017)). The *Darden* standard is "highly generalized" and its application "can demand a substantial element of judgment," so state courts have significant leeway in applying it. *Id.*; *Bell*, 70 F.4th at 390. Nevertheless, even within the federal habeas framework, deference does not imply abandonment or abdication of judicial review. *Evans*, 966 F.3d at 775.

The first step in applying *Darden* is analyzing the comments under scrutiny to determine whether they were improper. *Id.* Borizov's challenges fall into three categories, which he labeled in his direct appeal as (1) comments ridiculing defense counsel; (2) comments disparaging Borizov; and (3) misstatements of law. (Direct Appeal Br. at 23-34.) Respondent contends that the state court's rejection of all but four of Borizov's challenges was reasonable. We agree for the reasons discussed below.

### 1. The Illinois Appellate Court Reasonably Concluded that Most of the Prosecution's Comments Were Not Improper

#### a. Comments Critical of the Defense

Borizov argued that it was improper for the prosecution to characterize the defense's theory as "laughable," "ludicrous," a "joke," and something that "should be thrown in a giant dumpster." (Trial Tr. at 3571, 3578, 3579, 3593.) The prosecution further stated that defense counsel was trying to "trick," fool[]," and "distract" the jury with "strateg[ies]" and "tactic[s]." (*Id.* at 3572, 3574, 3583, 3590, 3591.) Toward the end of the rebuttal closing, the prosecution remarked, "They want you to believe Jake Nodarse . . . is hallucinating about only Johnny Borizov. How gullible

do they think you are?  Do they think you are a zero on a gullibility scale?"  (*Id.* at 3599.)  The prosecution also declared that Borizov "thinks he is going to outsmart us all.  The law is not dumb.  And neither are you."  (*Id.* at 3611.)  Borizov asserted on appeal that it was outside the bounds of proper argument to mock the defense and tell the jury that defense counsel was employing deception and relying on the jurors' being gullible or dumb.  (Direct Appeal Br. at 28-31.)

The Illinois Appellate Court found that there was error only as to the comment about the jurors' "gullibility scale."  2015 IL App (2d) 130736-U, ¶¶ 87-89.  A prosecutor may not argue that defense counsel is attempting to dupe jurors; such comments tend to improperly shift the focus away from the actual evidence in a case.  *Id.* ¶ 87.  The "gullibility scale" comment, said the court, did not pertain to the evidence presented or the reasonable inferences to be drawn from it; rather, the comment served no purpose but to draw the jury's attention away from the actual issues in the case and prejudice them against the defense.[6]  *Id.* ¶ 89.  But there was no error as to the remainder of the remarks in the first category since they were made not to disparage defense counsel but to criticize the defense's theory of the case, and it is permissible for a prosecutor to challenge the credibility and persuasiveness of a defense theory.  *Id.* ¶ 85 (citing cases).

The court's conclusions were appropriate.  Aside from the "gullibility scale" comment, the prosecution's statements about defense counsel's arguments were harsh but not improper.  Rather than disparaging defense counsel personally, they targeted the defense's theory of the case.  A prosecutor is permitted to criticize defense counsel's tactics and attack defense theories.  *Tijerina v. Lashbrook*, No. 14 C 343, 2017 WL 1319669, at *5-6 & n.4 (N.D. Ill. Apr. 6, 2017); *United States v. Bloom*, 846 F.3d 243, 254 (7th Cir. 2017); *United States v. Washington*, 417 F.3d 780,

---

[6]     The court also observed that the remark was incorrectly phrased; if a juror was considered a "zero on the gullibility scale," they would not be gullible at all.  *Id.* ¶ 89.

786-87 (7th Cir. 2005) (finding no misconduct where the prosecutor characterized defense counsel's arguments as "made up," "absolutely false," "ridiculous," and "ludicrous," reasoning that while the remarks "pushed the bounds of zealous advocacy," they were "largely focused on the lameness of the defense rather than defense counsel personally").

### b.  Comments Critical of Borizov

The second category of comments comprises those that Borizov claims were made for the sole purpose of disparaging him.  First, the prosecution said that Borizov has an "evil heart."  (Trial Tr. at 3420.)  Second, the prosecution argued that Borizov "hated" Angela and referred to a bartender's testimony that in February 2010, Borizov was at a bar with other women and made derogatory statements about Angela, including "fuck that bitch."  (*Id.* at 2302, 3421, 3575.)  Third, the prosecution portrayed Borizov as a bad father by commenting that he did not want Angela to go to a meeting to apply for "aid for children," and he was "out" on nights when he had custody of Nicholas, including when he went to the casino on the night of the killings.  (*Id.* at 3439-40, 3445, 3470.)  Fourth, the prosecution stated that "if [Borizov] didn't [solicit and assist Nodarse in committing the crimes], he is not guilty of anything, and he walks out the door and he can go fight some more for custody of Nicholas," thereby improperly suggesting that the jury should convict Borizov to protect Nicholas from him.  (*Id.* at 3572.)

The Illinois Appellate Court concluded that most of the prosecution's remarks about Borizov constituted error, reasoning that the "evil heart" remark referred to Borizov himself, not his plan, and it is improper to call a defendant "evil"; the comment regarding Borizov's opposition to Angela's attending the aid meeting pertained to excluded evidence (which the State conceded); and the statement in rebuttal about the future custody of Nicholas was irrelevant and should have been met with an instruction to the jury to disregard it.  2015 IL App (2d) 130736-U, ¶¶ 91-101.

The court held that it was not error, however, for the prosecution to assert that Borizov hated Angela because it was reasonable to infer from the evidence, including Borizov's own statements about her, that he felt that way. 2015 IL App (2d) 130736-U, ¶ 96. Furthermore, since defense counsel had stated in his opening statement that Borizov was a "great father" who "loved and still loves Angela Kramer to this day," (Trial Tr. at 172), the prosecution did not err in commenting on Borizov's conversation at the bar or the fact that he was not at home on certain nights when he had custody of Nicholas. *Id.* These conclusions were not unreasonable. The prosecution's assertion that Borizov "hated" Angela was a fair inference from the evidence, which included the bartender's testimony concerning Borizov's visit to the bar with other women and derogatory statements about Angela. Inferences drawn from the evidence are "fair game for closing argument." *London v. Clements*, 600 F. App'x 462, 467 (7th Cir. 2015); *Duncan v. Atchison*, No. 12 C 10362, 2014 WL 4062737, at *10 (N.D. Ill. Aug. 13, 2014) (a prosecutor may characterize evidence in a way that does not benefit the defendant). In addition, the comment, as well as the comments about Borizov having been out on nights when he had custody of Nicholas, including the night of the murders, was permissible as a direct response to defense counsel's assertions about Borizov. *See, e.g.*, *Whitehead v. Harrington*, No. 14 C 4118, 2017 WL 4699241, at *14 (N.D. Ill. Oct. 19, 2017) (prosecution's statements in closing argument are not improper when responsive to defense remarks).

### c. Comments on the Law

The third category of challenged remarks consists of three statements the prosecution made during rebuttal closing argument, which Borizov says are misstatements of law. The first instance related to Nodarse's testimony that he may have kicked in the door to Angela's bedroom on the night of the murders. Angela had previously testified that she did not recall her door having been

kicked.  Defense counsel presented a theory in closing argument that in fact the door was not kicked in, and Nodarse had never gone upstairs to "go after" Angela, because his real motive on the night of the killings was to kill Michael.  (Trial Tr. at 3535-37.)  In rebuttal, the prosecution pointed out that during extensive cross-examination of an investigator who was at the crime scene on March 2, 2010, defense counsel did not inquire about whether Angela's door had been kicked in.  (Trial Tr. at 3586-87.)  This remark, Borizov argued, impermissibly shifted the burden of proof by focusing on potentially exculpatory evidence that defense counsel had failed to elicit.  (Direct Appeal Br. at 27-28.)

The Illinois Appellate Court held that the prosecution's remark was not error; defense counsel had provoked the response by asserting in closing argument that a lack of evidence regarding Angela's door supported the defense's theory of the case.  2015 IL App (2d) 130736-U, ¶¶ 103-04.  This determination was reasonable.  By arguing in closing that Nodarse was an unreliable witness and that he had never gone upstairs at the Kramers' home based on the lack of physical evidence that Angela's door had been kicked in, defense counsel had invited the prosecution's observation in rebuttal that defense counsel never cross-examined the detective about whether such evidence was found.  Under those circumstances, the prosecution's comment was permissible and did not shift the burden of proof.  *See, e.g.*, *United States v. Butler*, 71 F.3d 243, 255 (7th Cir. 1995) (where the defense theory rests on the unreliability of the government's witness and there are witnesses other than defendant who can provide evidence to support the defense theory, a prosecutor may imply that the failure of the defense to present available evidence in opposition to the government's witness (other than the defendant's testimony) supports a conclusion that the government's witness is reliable); *United States v. Kelly*, 991 F.2d 1308, 1314 (7th Cir. 1993) (commenting on a defendant's failure to ask particular questions of a witness does

not have the effect of shifting the burden of proof unless it taxes the exercise of the defendant's right not to testify).

The second purported misstatement of law pertained to the jury instruction on accomplice-witness testimony, Illinois Pattern Jury Instruction, Criminal No. 3.17, which states that the testimony of a witness who says he was involved in the commission of a crime with the defendant is subject to suspicion and should be considered with caution and examined in light of the other evidence. After stating that the instruction "makes sense" and the jury "should follow it," the prosecution told the jury:

> We don't have two guys that are arrested at the same time. Or they don't have to be arrested at the same time. But it's not that kind of case. And go ahead and analyze what [Nodarse] says. It's too late now. You have already analyzed it beyond belief. You have heard him for three days testifying, and you have seen hours and hours of video. So, you already accomplished that goal.

(Trial Tr. at 3587-88.) Borizov contended that this statement was essentially an invitation to disregard the instruction due to the length of time Nodarse spent on the stand as well as an inaccurate suggestion that it was too late for the jury to critically assess Nodarse's testimony at a point in the trial when it was not permitted to have begun evaluating the evidence. (Direct Appeal Br. at 26-27.)

The appellate court found that the prosecution's comment about the accomplice-witness instruction, while "undoubtedly careless," was not improper because it did not amount to a direction to disregard the instruction and any possible error was cured by the jury's having received the proper instruction. 2015 IL App (2d) 130736-U, ¶ 107. This determination was reasonable. The prosecution's remarks were somewhat disjointed and difficult to follow in the first place, and a close examination when read in context indicates that it did not reach the level of an improper invitation to disregard the instruction. The prosecution prefaced the remarks by stating twice that

the jury *should* follow the instruction, so the gist was simply that Nodarse's testimony held up under suspicion. Even if the remarks sent a mixed message about the accomplice-witness instruction, it was cured by the trial court having subsequently provided the instruction to the jury. *See, e.g.*, *Clark v. Lashbrook*, 906 F.3d 660, 665 (7th Cir. 2018) ("To the extent that any prejudice arose due to the ambiguous nature of the [prosecutor's] statement, the clear jury instructions cured it."); *Ruvalcaba v. Chandler*, 416 F.3d 555, 566 (7th Cir. 2005).

In the third challenged statement, the prosecution told the jury at the close of its rebuttal argument: "If you follow the law like you promised and you follow the evidence which you heard, there is only one choice that you have. And that is to find this defendant guilty of everything he is charged with." (Trial Tr. at 3612.) Borizov argued that this statement was an improper admonition to the jury that they would not be living up to their oath should they return a verdict of not guilty. (Direct Appeal Br. at 25-26.)

Although the court found that the prosecution's assertion that the jury could only render one appropriate verdict in accordance with its promise "flew dangerously close to the line of impropriety," it did not find error in the remarks. 2015 IL App (2d) 130736-U, ¶¶ 108-10. The court explained that since defense counsel reminded the jury on several occasions during closing argument that it had promised to hold the State to its burden of proof, counsel had opened the door to the prosecution's lone reference to the jury's promise. *Id.* ¶ 110. This analysis was not unreasonable. While the prosecution's commentary was ham-handed because it risked implying that the jury's oath compelled it to convict Borizov, it came on the heels of defense counsel's use of the refrain "you promised" in her closing argument to the jury. (Trial Tr. at 3568, 3570.) And, as Respondent points out, the prosecution's comment did not amount to a statement that the jury

would not be doing its job if it acquitted Borizov. The prosecution called for a verdict premised on the evidence, which is proper.

> ### 2. The Illinois Appellate Court Reasonably Concluded that the Prosecution's Improper Comments Did Not Deprive Borizov of His Right to a Fair Trial

Under *Darden,* only if a prosecutor's statements were improper must we decide whether they "so infected the trial with unfairness" to have denied Borizov his due process right to a fair trial. *See Evans*, 996 F.3d at 775. A prosecutor's remarks are measured within the context of the trial as a whole to determine whether there was prejudicial error. *Carter v. Ryker*, No. 10 C 3783, 2011 WL 589687, at *8 (N.D. Ill. Feb. 9, 2011).

As discussed above, the Illinois Appellate Court concluded that the prosecution made four errors during closing argument: the "gullibility scale" comment, the suggestion that Nicholas's future custody was a factor the jury should consider, and the statements that Borizov had an "evil heart" and did not want Angela to go to the "aid for children" meeting. 2015 IL App (2d) 1307360-U, ¶ 112. Thus, we must decide whether those improper comments deprived Borizov of a fair trial. *See Evans*, 996 F.3d at 778. Several factors guide our inquiry: whether the prosecution misstated evidence; whether the remarks implicated Borizov's specific rights; whether the defense invited the comments; the trial court's instructions; Borizov's opportunity to rebut the improper remarks; and the weight of the evidence against Borizov. *See id*. at 778-79 (citing *Darden*, 477 U.S. at 181). The weight of the evidence is most important, but the factors are not applied rigidly, and we use them only as a guide to decide whether there was fundamental unfairness that "infected the bottom line." *Id.* at 779 (quoting *Hough v. Anderson*, 272 F.3d 878, 903 (7th Cir. 2001)).

When considering whether the improper remarks were a material factor in Borizov's convictions, the state court first set out the elements of the charged crimes:

> Defendant does not dispute that Nodarse committed the first-degree murders of
> Michael, Jeffrey, and Lori. . . . [T]he State's theory was that defendant was
> accountable for these crimes. A person is legally accountable for the conduct of
> another when, "either before or during the commission of an offense, and with the
> intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees,
> or attempts to aid that other person in the planning or commission of the offense."
> 720 ILCS 5/5–2(c) (West 2010). The State also charged defendant with the
> solicitation of Angela's murder. A person commits the offense of solicitation of
> murder when, with the intent that the offense of first-degree murder be committed,
> he or she "commands, encourages, or requests another to commit that offense." 720
> ILCS 5/8–1(b) (West 2010). The jury was instructed accordingly regarding each
> of the charged crimes.

2015 IL App (2d) 130736-U, ¶ 113. The court then reviewed the evidence, which centered on

Nodarse's testimony that Borizov convinced him of the need to kill the Kramers, in part because

of claimed threats from members of his criminal organization; helped Nodarse devise the plan to

kill them; and told him precisely when and how to carry out the plan. *Id.* ¶¶ 114-15. The court

acknowledged that Nodarse's story presented "obvious cause for skepticism" but observed that he

consistently recounted the same story when he was interviewed three times in the days following

the murders, and the interviews occurred before he agreed to testify against Borizov in exchange

for dismissal of two of the murder charges. *Id.* ¶ 116.

The court also discussed the extensive evidence corroborating various aspects of Nodarse's

story. Angela had testified that she was at a casino with Borizov in 2007 when he told her that he

needed to be captured on surveillance video because he had "people out there doing stuff" for him.

*Id.* ¶ 117. Nodarse later testified that Borizov told him to kill the Kramers at precisely 3:00 a.m.

on March 2 because Borizov intended to be somewhere with surveillance cameras that could verify

his alibi. *Id.* Borizov was indeed captured on surveillance video at a casino at the time Nodarse

killed the Kramers. *Id.* A witness testified that she spoke with Borizov while the two smoked

cigarettes around 3:30 a.m. and that he appeared nervous and repeatedly checked his phone. *Id.*

There was also testimony from other witnesses corroborating Nodarse's belief that Borizov was

dangerous and involved with powerful criminals as well as his belief that he was going to be killed on the night of February 20, 2010. *Id.* ¶¶ 118-19. Furthermore, there was evidence that Nodarse had written a lengthy suicide note to his family before the killings, in which he stated that although he had done "nothing" to the people he believed were threatening him, "they wanted to kill me and all of you" and that he had considered informing the police, but that option would have endangered his family because the people who posed a threat "know cops that are bad and help them find people!" *Id.* ¶ 120.

The jury also heard evidence that Nodarse and Borizov communicated very frequently until two days before the killings, the point at which Nodarse said Borizov had instructed him to stop calling and texting him. *Id.* ¶ 121. Between January 17 and February 27, 2010, Borizov called Nodarse 179 times, and Nodarse called Borizov 171 times, with at least one call each day. They also texted each other 80 times between February 6 and February 27, with at least one text each day. But on February 28 and March 1, neither called or texted the other. On the day of the murders, Nodarse called Borizov six times, but Borizov did not answer and did not call Nodarse. *Id.*

Finally, the jury heard audiotapes in which Borizov had made several statements to Nodarse while the two men were in holding cells at the Darien police station after the murders. *Id.* ¶ 122. Borizov told Nodarse that they were likely being recorded, but nonetheless asked him, "Gloves on out there?" *Id.* Nodarse replied, "Gloves for like winter football." *Id.* Borizov responded, "Then why are these people telling me you left prints out there?" *Id.* Later, Borizov asked Nodarse where he had left his gun and whether he had directed police to the gun. *Id.*

In light of all this evidence, the Illinois Appellate Court disagreed with Borizov's contention that this was a closely balanced case. *Id.* ¶ 124. It also concluded that while the

prosecution's four improper comments were "disturb[ing]," it did not believe that they constituted a pervasive pattern of misconduct that resulted in unfair prejudice to Borizov.  *Id.*

We agree with Respondent that the Illinois Appellate Court reasonably concluded that Borizov was not prejudiced by the cumulative effect of the prosecution's four improper comments in closing argument.  It is true that defense counsel did not invite the comments and Borizov did not have the opportunity to rebut those regarding custody of Nicholas and the gullibility scale because they were made during the rebuttal closing.  But the remarks were fleeting, and Borizov did have the opportunity to rebut the "evil heart" comment and the remark that he did not want Angela to attend the children's-aid meeting.  Furthermore, the remaining *Darden* factors do not support Borizov's claim.  While the comment about the meeting referred to excluded evidence, the comments did not involve misstatements of the evidence, and they do not appear to have implicated any of Borizov's specific constitutional rights.  Additionally, the record reflects that the trial court instructed the jury that it was to determine the facts only from the evidence in the case and apply the law to the facts to decide the case; the evidence consisted only of the testimony of the witnesses and the exhibits that the court had received; opening and closing statements are not evidence; and it should disregard any statement or argument the attorneys made that was not based on the evidence.  (Trial Tr. at 3618-20.)  Most importantly, the evidence weighed strongly against Borizov.  As outlined above, the State presented substantial evidence that Borizov was legally responsible for Nodarse's conduct, including evidence that corroborated Nodarse's account of events.  "Strong evidence of guilt eliminates any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations." *Lieberman v. Washington*, 128 F.3d 1085, 1098 (7th Cir. 1997) (brackets omitted).  Viewing Borizov's trial as a whole and considering the *Darden* factors, we hold that the Illinois Appellate Court reasonably found that the prosecution's four

isolated improper comments did not deprive Borizov of a fair trial.  Accordingly, no federal habeas relief is warranted on Claim 1(a).

For the reasons stated above, we deny habeas relief on all of Borizov's claims.

**D.     Certificate of Appealability**

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts requires us to "issue or deny a certificate of appealability" when we enter "a final order adverse to the applicant."  A certificate of appealability may issue only if the petitioner has made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  In deciding whether a certificate of appealability should issue, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Buck v. Davis*, 580 U.S. 100, 115 (2017) (internal punctuation and citation omitted).  Because Borizov has failed to make such a showing, we decline to issue a certificate of appealability.

## CONCLUSION

For the reasons stated above, we deny Johnny Borizov's amended § 2254 petition [43] and decline to issue a certificate of appealability.  The Clerk of Court is directed to substitute as Respondent Charles Truitt, Warden of Stateville Correctional Center, and alter the case caption to *Borizov v. Truitt*.  Civil case terminated.

Marvin E. Aspen
United States District Judge

Date: March 28, 2024

35